931 F.2d 599
 FEDERAL INSURANCE COMPANY, a New Jersey corporation,
Plaintiff-Appellant,
v.
SCARSELLA BROTHERS, INC., a Washington corporation; David
Rose; Jane Doe Rose, husband and wife and the marital
community composed thereof; Stanley Alan Peters; Diana
Peters, husband and wife composed thereof; John F. Kovarik,
guardian ad litem for Amber Lynn Peters, a minor;
Washington Insurance Guaranty Association, Defendants-Appellees.
 No. 88-4378.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1990.
Decided April 29, 1991.
As Amended May 9, 1991.
 
 Craig H. Bennion, Cozen and O'Connor, Seattle, Wash., for plaintiff-appellant.
 Jerry W. Spoonemore and Stuart P. Kastner, Montgomery, Purdue, Blankinship & Austin, Seattle, Wash., for defendant-appellee (Scarsella).
 Martin T. Collier, Betts, Patterson & Mines, P.S., Seattle, Wash., for defendant-appellee (WIGA).
 Appeal from the United States District Court for the Western District of Washington.
 Before TANG, D.W. NELSON and CANBY, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 Federal Insurance Company ("Federal") appeals the decision of the district court granting and denying motions for summary judgment in an action for declaratory relief. Federal contends the district court erred in declaring that Federal was liable under an excess insurance policy to provide coverage in place of Integrity Insurance Company ("Integrity"), an insolvent underlying insurer. We affirm the district court, holding that when an insurer agrees to provide coverage in excess of underlying insurance that has been "exhausted," and the term "exhausted" is not defined by the policy, the excess insurer has assumed the risk of underlying insurers' insolvency.
 
 
 2
 * On June 12, 1985, members of the Peters family were severely injured in an automobile accident in King County, Washington. The Peters' vehicle was hit by a truck driven by David Rose and owned by Scarsella Brothers, Inc. ("Scarsella"). The Peters subsequently sued Rose, his wife, and Scarsella in Washington state court for personal injuries allegedly sustained in the accident. The Peters sought damages in excess of $1.5 million.
 
 
 3
 At the time of the accident, Scarsella's potential liability was covered by three insurance policies layered as to the order in which the insurers were obligated to provide coverage. A policy issued by United Pacific Insurance Company ("United Pacific") provided the primary level of coverage with a limit of $500,000 per occurrence. Integrity provided the first layer of excess liability coverage in the amount of $1 million. Federal provided the second layer of excess liability coverage in the amount of $9 million. Thus, Federal would normally provide coverage only to the extent that Scarsella's liability exceeded $1.5 million.
 
 
 4
 After the Peters' accident, but before any claims were paid, Integrity became insolvent. Ordinarily, the Washington Insurance Guaranty Association ("WIGA") would provide coverage in place of Integrity, up to a limit of $300,000. See Wash.Rev.Code Sec. 48.32.060(1)(a).[1] However, WIGA's responsibility with regard to Integrity's liability is uncertain, given the excess liability policy issued by Federal.
 
 
 5
 On May 3, 1988, Federal filed this action against the Peters, the Roses, Scarsella, and WIGA to obtain a judicial declaration that, under the excess liability policy issued to Scarsella, Federal was not required to "drop down" and cover Scarsella's liability between $500,000 and $1.5 million, the range for which Integrity would have provided coverage but for the insurer's insolvency. Federal also sought a ruling that, regardless of whether Federal had to drop down, WIGA would be required to pay up to $300,000 before Federal would be required to pay. The defendants filed appropriate counterclaims and cross-claims seeking to establish the converse of the relief sought by Federal.
 
 
 6
 In the order appealed from, the district court granted Scarsella's summary judgment motion, ruling that Federal was obligated to drop down. The court also denied Federal's summary judgment motion, ruling inter alia that Federal must fulfill its obligations under the policy issued to Scarsella before WIGA's obligations would become due. WIGA, however, did not file a cross-motion for summary judgment on this latter issue, nor did WIGA otherwise seek an affirmative judgment on its counterclaim against Federal. Other claims also remain formally unresolved.
 
 
 7
 Shortly after the district court rendered its decision, Federal agreed to provide the disputed coverage, and to pay the Peters $5 million, less the $500,000 provided for by United Pacific. In settling the Washington state court lawsuit on behalf of Scarsella, Federal initially omitted an express reservation of its rights pending the outcome of this appeal. Subsequently, Federal attempted to insert a reservation of rights clause into the settlement agreement which, in the meantime, had been approved by the state court. The state court refused to amend the settlement agreement with regard to Federal's rights against the Peters, but allowed Federal an express reservation of rights against WIGA. Neither Federal nor WIGA was a party to the state court action. Federal timely appeals the decision of the federal district court.
 
 II
 
 8
 In granting Scarsella's summary judgment motion against Federal, and denying Federal's summary judgment motion against WIGA, the district court established law of the case sufficient to decide every cause of action pleaded in this lawsuit. Yet because WIGA did not move for summary judgment against Federal based on law of the case, WIGA's counterclaim against Federal remains technically undecided.[2]
 
 
 9
 Under these circumstances, we normally would lack jurisdiction over this case absent an express determination by the district court that there was no just reason for delaying Federal's appeal. See Frank Briscoe Co. v. Morrison-Knudsen Co., 776 F.2d 1414, 1416 (9th Cir.1985); Fed.R.Civ.P. 54(b). Furthermore, we usually would be powerless to consider the denial of Federal's summary judgment motion against WIGA. See Suydam v. Reed Stenhouse, Inc., 820 F.2d 1506, 1511 (9th Cir.1987). Nevertheless, because the district court's order resolved all issues necessary to establish the legal rights and duties of the parties, we will consider the order as final for purposes of 28 U.S.C. Sec. 1291, even though its statement of the relationships among the parties is not precise. See Planet Ins. Co. v. Mead Reins. Corp., 789 F.2d 668, 670 (9th Cir.1986).[3] In doing so, we think it important that the only matters left unresolved are purely questions of law on which judgment has been rendered a mere formality by law of the case. Federal's appeal is therefore proper. Cf. Fed.R.App.P. 4(a)(2) (notice of appeal from final order valid even when filed before entry of formal judgment).[4]III
 
 
 10
 After the district court rendered its decision on Federal's summary judgment motion, Federal settled the underlying state court tort action on behalf of its insured, Scarsella. In doing so, Federal provided coverage in place of the insolvent insurer, Integrity. The settlement agreement allegedly did not reserve Federal's rights against Scarsella pending the outcome of this appeal. Subsequent to the signing of the agreement, the state court purportedly included a clause reserving Federal's rights against WIGA.
 
 
 11
 Federal contends this appeal is not moot because, unless this court affirms the district court, Federal will sue its insured (to recover the amount paid under the settlement agreement) and WIGA (to recover on a claim for contribution). Whether the settlement agreement itself would preclude these lawsuits involves questions of state law which, Federal argues, are not before this court.
 
 
 12
 These are difficult questions that Federal presents. For example, it is unclear to what degree we must examine a settlement agreement in light of state law in order to determine whether a case is moot. Compare Chemical Waste Management, Inc. v. Broadwater, 758 F.2d 1538, 1539-40 (11th Cir.1985) (declining to rule on novel questions of state law which could determine whether the appeal was justiciable) with Harrison W. Corp. v. United States, 792 F.2d 1391, 1392-93 (9th Cir.1986) (deciding a threshold question of federal law in order to determine whether appeal was moot). Furthermore, the questions of state law on which the present issue of mootness turns are, in themselves, novel and complex.
 
 
 13
 Where an appeal presents difficult questions concerning jurisdiction, we may forego the resolution of such issues if the merits of the appeal are insubstantial. See Norton v. Mathews, 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976); Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 666 n. 15 (9th Cir.1988). In deciding whether we may take this course, it is relevant to consider the extent to which the effect of our decision would vary depending on whether the jurisdictional question is addressed. Norton, 427 U.S. at 532, 96 S.Ct. at 2775. As will appear below, the merits of this appeal are insubstantial; the district court's decision is easily affirmed. Furthermore, we note the effect of our decision is likely the same as the effect if we were to find the appeal moot. See Allard v. DeLorean, 884 F.2d 464, 467 (9th Cir.1989) (where appeal mooted by settlement, district court should determine whether judgment should be vacated). Accordingly, in view of the difficult jurisdictional questions presented, we will assume--without deciding--that this appeal is not moot. See Norton, 427 U.S. at 532, 96 S.Ct. at 2775.
 
 IV
 
 14
 This court reviews de novo the district court's construction of an insurance policy. American States Ins. Co. v. Borbor by Borbor, 826 F.2d 888, 890 (9th Cir.1987). A grant of summary judgment is also reviewed de novo, in part to determine whether the substantive law was correctly applied. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). Furthermore, the district court's interpretation of state law is reviewed de novo. Bancorp Leasing & Fin. Corp. v. Agusta Aviation Corp., 813 F.2d 272, 274 (9th Cir.1987).
 
 
 15
 The parties have not discussed which body of law governs this diversity action. To determine the applicable law, a federal district court is to apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); General Accident Ins. Co. v. Namesnik, 790 F.2d 1397, 1398 (9th Cir.1986). This case originates from the Western District of Washington. When interpreting a disputed contract, Washington state courts generally apply the law of the state in which the contract was formed. See Bush v. O'Connor, 58 Wash.App. 138, 146, 791 P.2d 915, 920, review denied, 115 Wash.2d 1020, 802 P.2d 125 (1990); Dairyland Ins. Co. v. State Farm Mut. Auto. Ins. Co., 41 Wash.App. 26, 30-34, 701 P.2d 806, 808-10, review denied, 104 Wash.2d 1016 (1985). Here, there is no reason to believe the insurance contract between Federal and Scarsella was not formed in Washington. The law of Washington therefore governs this case.
 
 
 16
 In determining the applicable Washington law, we are required to "ascertain from all the available data what the state law is...." West v. American Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); accord Insurance Co. v. Associated Int'l Ins. Co., 922 F.2d 516, 520 (9th Cir.1990). In the absence of controlling decisions by the state's highest court or intermediate appellate courts, we will look to well-reasoned decisions from other jurisdictions. Id.
 
 
 17
 The Washington Supreme Court has set forth the following law on interpreting insurance contracts:
 
 
 18
 If the language in an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify the contract or create ambiguity where none exists. However, if a policy provision on its face is fairly susceptible to two different but reasonable interpretations, the policy is ambiguous and the court must attempt to discern and enforce the contract as the parties intended.
 
 
 19
 To determine the parties' intent, the court first will view the contract as a whole, examining its subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. If the court determines that the policy remains ambiguous even after its consideration of the extrinsic evidence, the court will apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning.
 
 
 20
 Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys., 111 Wash.2d 452, 456-57, 760 P.2d 337, 340 (1988) (citations omitted). Here, the disputed provisions of the excess insurance policy issued by Federal are as follows:
 
 
 21
 1. INSURING AGREEMENT [hereinafter, the "Insuring Clause"]:
 
 
 22
 In consideration of the payment of the required premium and subject to all the terms of this policy, the Company agrees to pay on behalf of the insured LOSS resulting from any occurrence insured by the terms and provisions of the First UNDERLYING INSURANCE policy scheduled in Item 6 of the Declarations (except for the Limits of Liability and defense provisions, if any). The insurance afforded by this policy shall apply only in excess of and after all UNDERLYING INSURANCE (as scheduled in Item 6 of the Declarations) has been exhausted.
 
 
 23
 ....
 
 
 24
 5. MAINTENANCE OF UNDERLYING INSURANCE [hereinafter, the "Maintenance Clause"]:
 
 
 25
 The Insured agrees that the First UNDERLYING INSURANCE policy, and other UNDERLYING INSURANCE following the terms and provisions of the First UNDERLYING INSURANCE policy (except for limit of liability and defense provisions, if any), shall be maintained in full effect during the currency of this policy except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of occurrences happening during the period of this policy. The failure of the Insured to comply with the foregoing shall not invalidate this policy but in the event of such failure the Company shall only be liable to the same extent as if the Insured had complied with this condition.
 
 
 26
 (Emphasis added to disputed text.)
 
 
 27
 The Insuring Clause indicates Federal has assumed the duty of providing Scarsella coverage for a certain amount in excess of any amount recovered when underlying insurance is "exhausted." There is no question that the United Pacific policy has been exhausted; the only issue here concerns exhaustion of the Integrity policy. Thus, the question presented for our review is whether Integrity's insolvency "exhausted" Integrity's policy within the meaning of Federal's Insuring Clause. If so, Federal's obligation to provide up to $9 million in coverage would follow on the heels of the United Pacific coverage; as a practical matter, Federal would "drop down" and provide coverage in place of Integrity. If not, the alternative posed by Federal is a $1 million gap in Scarsella's liability coverage as a result of Federal not having to drop down in place of Integrity.[5] We hold that, under the policy provisions set forth above, Federal is obligated to drop down.
 
 
 28
 Because the term "exhausted" reasonably may or may not include insolvency, it is ambiguous. See Transcontinental Ins. Co., 111 Wash.2d at 456, 760 P.2d at 340. We must therefore attempt to discern the intent of the parties by referring to "extrinsic evidence." Id., 760 P.2d at 340. Federal argues that, when the Insuring Clause and the Maintenance Clause of its excess insurance policy are read together, it is evident that underlying insurance can only be exhausted "solely by payment of claims...." Thus, insolvency does not result in exhaustion of underlying insurance.[6] We disagree. The extrinsic evidence to which Federal points cannot resolve the meaning of the term "exhausted" appearing in the Insuring Clause. On its face, the Maintenance Clause defines a duty of the insured, not the insurer.[7] This provision therefore says little about terms appearing in the Insuring Clause, which sets forth duties of the insurer. Accordingly, the term "exhausted" appearing in the Insuring Clause remains ambiguous.[8] We therefore must apply the meaning and construction of the term "exhausted" that is most favorable to Scarsella. See Transcontinental Ins. Co., 111 Wash.2d at 457, 760 P.2d at 340.
 
 
 29
 In holding that the term "exhausted" as it appears in Federal's Insuring Clause includes insolvency, we are in agreement with the authority closest in point. See Fageol Truck & Coach Co. v. Pacific Indem. Co., 18 Cal.2d 748, 117 P.2d 669 (1941); cf. Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 640 P.2d 764, 180 Cal.Rptr. 628 (1982). The Fageol decision stands for the proposition that when an insurer assumes liability for an amount in excess of any amount recovered when underlying insurance is "exhausted," and the term "exhausted" is not otherwise defined by the excess policy, the excess insurer has assumed the risk of the underlying insurer's insolvency. 18 Cal.2d at 751-52, 117 P.2d at 671.[9] The Pisciotta court followed this reasoning where an insurer agreed to provide coverage in excess of "the amount recoverable under the underlying insurance...." 30 Cal.3d at 813-15, 640 P.2d at 771-72, 180 Cal.Rptr. at 635-37.[10]
 
 
 30
 The district court did not err in declaring that, because the term "exhausted" included insolvency, Federal was obligated to "drop down" and cover Scarsella's liability in place of Integrity.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 WIGA describes itself as a "nonprofit, unincorporated legal entity created by Washington statute." Under the law to which WIGA apparently refers, WIGA is obligated to pay certain claims that would have been paid by qualified insurers but for their insolvency. Wash.Rev.Code Secs. 48.32.030-.060. WIGA concedes that Integrity qualifies as an insolvent insurer, and that Scarsella's claim qualifies as a covered claim. See Wash.Rev.Code Sec. 48.32.030(4), (5)
 
 
 [2]
 The formal judgment entered by the district court also omits other claims, counterclaims, and cross-claims. For purposes here, these claims are indistinguishable from WIGA's counterclaim against Federal. Therefore, WIGA's counterclaim will be treated as representative of all outstanding claims
 
 
 [3]
 In particular, we note the district court's order resolved that Federal is primary to WIGA in providing coverage in place of the underlying insolvent insurer. At oral argument, the following exchange occurred:
 COURT: [A]ssuming that Federal is required to drop down, was your relationship to WIGA established by the ruling of the district court?
 FEDERAL: If Federal is required to drop down?
 COURT: Yes.
 ...
 FEDERAL: Yes, Your Honor, it was.... The effect of the district court's order is that Federal drops down and WIGA pays after Federal.
 COURT: You feel that that was established by the district court?
 FEDERAL: Yes....
 On appeal, Federal does not challenge this determination of the district court. Instead, Federal argues that, if this court finds that the district court erred in declaring that Federal should provide coverage in place of the underlying insolvent insurer, then this court should also hold that WIGA is primary to Federal in covering Scarsella's tort liability. In view of our disposition of the case, we need not consider this latter issue.
 
 
 [4]
 Of course, a district court does not always establish law of the case when it denies a summary judgment motion. Indeed, we have gone so far as to say that "the law of the case doctrine does not apply to pretrial rulings such as motions for summary judgment." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir.1986) (citing Preaseau v. Prudential Ins. Co. of America, 591 F.2d 74 (9th Cir.1979)). The Shouse opinion, however, overstates the rule. Cf. Preaseau, 591 F.2d at 79-80 (district court did not abuse its discretion in case removed from state court when district court chose not to follow state court's previous ruling on summary judgment). Because the law of the case doctrine is amorphous, see Cale v. Johnson, 861 F.2d 943, 947 (6th Cir.1988) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4478, at 790-95 (1981)), it is not easily susceptible to such broad generalizations. We believe it proper to apply the doctrine in the present context, given that the district court clearly intended to decide the issues at hand. Cf. Dessar v. Bank of Am. Nat'l Trust & Sav. Ass'n, 353 F.2d 468, 470 (9th Cir.1965) (indicating law of the case may be established when order denying summary judgment motion manifests intent to decide issue)
 
 
 [5]
 Federal does not dispute it must cover Scarsella's liability to the extent it exceeds $1.5 million
 
 
 [6]
 Consistent with this argument, Federal apparently looks to the Maintenance Clause to define its duty under the policy in the event that the insurer is not required to drop down. Rather than arguing its duty under the insurance contract is conditioned on exhaustion of underlying insurance, Federal remains willing to provide coverage to Scarsella in excess of $1.5 million. Federal's willingness may be based upon the provision in the Maintenance Clause stating, "[t]he failure of the insured to comply with the foregoing shall not invalidate this policy but in the event of such failure the Company shall only be liable to the same extent as if the insured had complied with this condition."
 
 
 [7]
 Specifically, the phrase "solely by payment of claims" appearing in the Maintenance Clause concerns only an exception to the insured's duty to maintain "in full effect" the particular underlying insurance policies "scheduled in Item 6 of the Declarations." There is no question here that Scarsella complied with the Maintenance Clause
 
 
 [8]
 We recognize the Eighth Circuit was not troubled by reading "as a whole" an identical Insuring Clause and Maintenance Clause for the purpose of defining the term "exhausted." See Interco Inc. v. National Sur. Corp., 900 F.2d 1264, 1268 (8th Cir.1990). The Interco case is distinguishable, however, on the basis that the term "exhausted" was defined in a policy endorsement not present here. See id. To the extent the Interco court nevertheless looked to the Maintenance Clause for the purpose of defining the term "exhausted," we choose not to follow this course for reasons stated in the text and footnote 7
 
 
 [9]
 We note the decision in Fageol was rendered as a matter of Washington state law. See the companion case, Fageol Truck & Coach Co. v. Pacific Indem. Co., 18 Cal.2d 731, 737, 117 P.2d 661, 664 (1941)
 
 
 [10]
 Although the policy at issue in Pisciotta did not include the term "exhausted," the decision is important for its application of Fageol in the context of a true excess insurance policy. In turn, although the excess policy in Pisciotta was "applicable either as excess insurance over any 'amounts recoverable' under the primary policy or as alternative primary coverage as to losses 'not covered by' the primary policy," 30 Cal.3d at 812, 640 P.2d at 770, 180 Cal.Rptr. at 634 (emphasis added), the facts in Pisciotta implicated only the excess insurance provisions. See id. at 812-13, 640 P.2d at 771, 180 Cal.Rptr. at 635. Thus, in view of the decision in Pisciotta, Federal's attempt to distinguish Fageol on the ground that the policy in that case was not a "true umbrella or catastrophe policy, ... but rather was a primary insurance policy with an excess-type 'other insurance' clause" is not persuasive